Receipt number AUSFCC-10806185

# United States Court of Federal Claims

| | |
|---|---|
| **LABQ CLINICAL DIAGNOSTICS, LLC;** **DART MEDICAL LABORATORY, INC**., and **COMMUNITY MOBILE TESTING, INC**., | |
| *Plaintiffs*, | No. 25------  25-1755 C |
| v. | |
| **UNITED STATES OF AMERICA** | |
| *Defendant*. | |

## COMPLAINT

## INTRODUCTION

The Defendant's refusal to reimburse Plaintiffs for critical COVID-19 testing services provided to uninsured individuals under the COVID-19 Uninsured Program ("UIP"), compounded by its gross and negligent mismanagement of the program, has caused Plaintiffs damages of $542,879,073, or alternatively, $108,622,618, plus $22,403,457 incurred by Plaintiffs for insurance verification of patients.

During the COVID-19 pandemic, Plaintiffs—LabQ Clinical Diagnostics, LLC, Dart Medical Laboratory, Inc., and Community Mobile Testing, Inc.— performed over two million tests on uninsured individuals in reliance on the Defendant's statutory mandates under the CARES Act, Families First Coronavirus Response Act, Paycheck Protection Program and Health Care Enhancement Act, and American Rescue Plan Act (collectively, "The Government

1

Acts"), as well as the contractual framework established by the UIP Terms and Conditions ("UIP Terms and Conditions"). Plaintiffs performed 903,222 COVID-19 tests on uninsured individuals for which Plaintiffs reasonably expected to receive compensation under the UIP.

Defendant's refusal to pay Plaintiffs for providing these 903,222 tests constitutes a breach of the statutory mandates under the Government Acts and contractual framework established by the Defendant. In addition, Defendant's own failure to implement adequate oversight and verification processes, as detailed in the Office of Inspector General Report A-09-22-06001, led to the premature depletion of UIP funds, preventing reimbursement for Plaintiffs' valid claims. Compounding this failure, the Defendant abruptly closed the UIP on March 22, 2022, with only six days' notice, thwarting Plaintiffs' ability to submit claims amidst the December 2021 Omicron variant surge.

Further, rather than scrutinizing its own mismanagement or the failures of its administrative contractors, United HealthCare Services, Inc. ("UHSI") and OptumServe Technology Services, Inc. ("Optum"), who were tasked with administering the UIP and failed to ensure its fiscal integrity, the government has chosen to deflect responsibility and save face by pursuing baseless litigation against Plaintiffs, alleging false claims as a pretext to evade its payment obligations. As a result of the government's breaches of its statutory and contractual duties, coupled with its administrative negligence, Plaintiffs have suffered significant financial harm, entitling them to damages of $542,879,073, or alternatively, $108,622,618, plus $22,403,457 incurred by Plaintiffs for insurance verification for patients.

## PARTIES

1. LabQ Clinical Diagnostics, LLC ("LabQ") is a limited liability company organized under the laws of New York, with its principal place of business at 140 58th St., Bldg A Suite 3L, Brooklyn, NY 11220, and New Jersey at 100 International Drive, Budd Lake, NJ 07828.

2. Dart Medical Laboratory, Inc. ("Dart") is a corporation organized under the laws of New York, with its principal place of business at 140 58th St., Bldg A Suite 3L, Brooklyn, NY 11220, and New Jersey at 100 International Drive, Budd Lake, NJ 07828.

3. Community Mobile Testing, Inc. ("CMT") is a corporation organized under the laws of New York, with its principal place of business at 140 58th St., Bldg A Suite 3L, Brooklyn, NY 11220, and New Jersey at 100 International Drive, Budd Lake, NJ 07828.

4. During the COVID-19 pandemic, Plaintiffs acted together to provide COVID-19 testing services to millions of individuals and companies, including through mobile testing sites deployed throughout New York City including to uninsured individuals under the UIP.

5. Defendant, the United States of America, is sued herein through its agency, the Department of Health and Human Services, and its sub-agency, the Health Resources and Services Administration, which was responsible for administering the COVID-19 Uninsured Program.

## SUBJECT MATTER JURISDICTION

6.  This Court has subject matter jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), which grants jurisdiction over claims against the United States for money damages founded upon statutes that mandate payment and for breach of contract. The statutory framework, including the (1) CARES Act, (2) the Families First Coronavirus Response Act, (3) the Paycheck Protection Program and Health Care Enhancement Act and (4) the American Rescue Plan Act, coupled with the subsequent appropriation of public funds by Congress and the administrative implementation of the UIP reimbursement regime, created a money-mandating regime, requiring reimbursement for eligible testing services.

7.  Additionally, the UIP Terms and Conditions form a contract with Plaintiffs, enforceable under the Tucker Act.

## VENUE

8.  Venue is proper in this Court under 28 U.S.C. § 1491(a)(1), as this is a claim against the United States for monetary relief exceeding $10,000.

## FACTUAL BACKGROUND

**A. Statutory and Regulatory Framework of the Uninsured Program**

9.  In response to the COVID-19 pandemic, Congress enacted the CARES Act, Pub. L. 116-136, Section 3201, on March 27, 2020, amending the Public Health Service Act to create the Provider Relief Fund. This statute mandates that the Secretary of the Department of Health and Human Services ("HHS"), shall reimburse healthcare providers for expenses

4

attributable to the coronavirus, including testing of uninsured individuals, imposing a non-discretionary obligation when eligibility criteria are met.

10. Additional funding for the UIP was provided through the Families First Coronavirus Response Act ("FFCRA"), Pub. L. 116-127, the Paycheck Protection Program and Health Care Enhancement Act, Pub. L. 116-139, and the American Rescue Plan Act, Pub. L. 117-2, collectively reinforcing the government's commitment to reimburse providers.

11. The Health Resources and Services Administration ("HRSA"), an agency within HHS, administered the UIP, establishing a process for providers to submit claims via the UIP Portal. Providers were required to enroll, submit patient rosters, attest to patients' uninsured status, and obtain Temporary Patient IDs for claim submission through the Medicare Electronic Data Interchange ("MEDI") system.

12. The UIP Terms and Conditions, published by HRSA, explicitly stated that "the Secretary will reimburse the Recipient generally at 100 percent of Medicare rates" for eligible COVID-19 testing services provided to uninsured individuals. This promise was the cornerstone of the UIP's contractual framework, as it assured providers that their compliance with program requirements would result in payment.

**B. Audit Report Findings**

13. In July 2023, the Department of Health and Human Services Office of Inspector General published a report titled "HRSA Made COVID-19 Uninsured Program Payments to Providers on Behalf of Individuals Who

Had Health Insurance Coverage and for Services Unrelated to COVID-19,"

Report No. A-02-21-01013, July 2023 ("<u>OIG Report</u>"). The OIG Report,

covering payments from March 1 to December 31, 2020, documents systemic

failures in UnitedHealth's administration of the COVID-19 Uninsured

Program. The OIG Report is available online <u>here</u>.

14. The OIG Report identified the following critical issues with the COVID-19

UIP:

(a) **Payments for Insured Individuals**: HRSA made payments to healthcare providers on behalf of individuals who actually had health insurance coverage. These services should have been billed to the individuals' insurance plans rather than the UIP, which was exclusively intended for the uninsured.

(b) **Payments for Non-COVID-19-Related Services**: Funds were disbursed for services that had no connection to COVID-19, such as surgery for a broken ankle. The program's scope was strictly limited to COVID-19 testing, treatment, and vaccination, making these payments inappropriate.

(c) **Scale of Improper Payments**: Approximately $784 million of the $4.2 billion total disbursed through the program—nearly one-fifth—was identified as improper. This figure reflects payments for insured individuals, non-COVID-19 services, and, in some cases, services that were never provided.

(d) **Operational Context and Response**: The OIG acknowledged HRSA's goal of quickly disbursing funds to ensure uninsured individuals received care during the pandemic, which may have contributed to the errors.

15. The OIG Report estimates that nearly $784 million of $4.2 billion (19%) in

UIP payments were improper, affecting approximately 3.7 million patients

("On the basis of our sample results, we estimated that nearly $784 million

of $4.2 billion (or 19 percent) in UIP payments made to providers during our

audit period for approximately 3.7 million of 19.2 million patients were improper.").

## C. Plaintiffs' Reliance and Performance under the UIP

16. In or about July 2020, Plaintiffs registered with the UIP and thus entered into a contract with HRSA to receive payments for eligible COVID-19 testing services provided to uninsured individuals.

17. Between March 18, 2020 and May 11, 2023, Plaintiffs provided over two million COVID-19 tests to uninsured individuals, incurring significant costs in reliance on the UIP's statutory mandate and the explicit promises regarding reimbursement in the UIP Terms and Conditions.

18. Specifically, Plaintiffs enrolled in the UIP Portal and performed COVID-19 tests in reliance on HRSA's representation that eligible services would be reimbursed at Medicare rates of $123.46 per test including specimen collection, and $100 per test without specimen collection ("HRSA's Payment Rate"). Plaintiffs' published billing rate was $617 per test including specimen collection and $500 per test without specimen collection ("Plaintiffs' Billing Rate").

19. In total, Plaintiffs were not reimbursed by Defendant for 903,222 tests provided to individuals who attested to Plaintiffs as either: (1) being uninsured and no other insurance provider paid Plaintiffs, or (2) being insured, but were subsequently identified by Plaintiffs through investigation as having inactive or no insurance or were denied coverage due to multiple reasons. These 903,222 tests were performed between

March 18, 2020, and May 11, 2023, the end of the Public Health Emergency period during which HRSA was obligated to provide reimbursement. Because of HRSA's gross and negligent mismanagement of the program as detailed below, the UIP funds were depleted prematurely, causing the program to terminate before Plaintiffs' claims could be paid.

20. Plaintiffs advance two alternative theories of recovery. Under the Billing Rate Theory, damages are calculated at Plaintiffs' customary and published billing rates for the unreimbursed tests. Under the HRSA Payment Rate Theory, damages are calculated at the reimbursement rates set by HRSA's Uninsured Program. While the dollar values differ, both measures derive from the same core set of unreimbursed COVID-19 tests and demonstrate the magnitude of Defendants' failure to compensate Plaintiffs for services rendered.

## REIMBURSEMENT OWED BY DEFENDANT TO PLAINTIFFS AT PLAINTIFFS' BILLING RATE

21. The total value of the 903,222 COVID-19 tests for which Plaintiffs were not reimbursed at Plaintiffs' Billing Rate is $542,879,073. This amount includes:

A. $388,088,615 for individuals who attested to Plaintiffs that they were uninsured at the time of testing and for whom no other insurer paid. This figure is comprised of:

1. 544,595 tests with specimen collection at $617 per test (totaling $336,015,115), and

2.  104,147 tests without specimen collection at $500 per test (totaling $52,073,500).

B.  A total of $154,790,458 for individuals who initially attested to Plaintiffs that they were insured at the time of testing, but who were later determined by Plaintiffs' investigation to have inactive or no insurance, or whose coverage was denied for various reasons. This amount consists of:

1.  235,474 tests with specimen collection at $617 per test (totaling $145,287,458), and

2.  19,006 tests without specimen collection at $500 per test (totaling $9,503,000).

## REIMBURSEMENT OWED BY DEFENDANT TO PLAINTIFFS AT HRSA'S PAYMENT RATE

22. The total value of the 903,222 COVID-19 tests not reimbursed by Defendant to Plaintiffs at HRSA's Payment Rate is $108,622,618. This amount includes:

A.  $77,650,398 for individuals who attested to Plaintiffs that they were uninsured at the time of testing, and for whom no other insurance provider paid Plaintiffs. This amount consists of:

1.  544,595 tests with specimen collection at $123.46 per test (totaling $67,235,698), and

2.  104,147 tests without specimen collection at $100 per test (totaling $10,414,700).

9

B. $30,972,220 for individuals who attested to Plaintiffs that they were insured at the time of testing but were later determined by Plaintiffs' investigation to have inactive or no insurance, or whose coverage was denied for various reasons. This amount consists of:

   1. 235,474 tests with specimen collection at $123.46 per test (totaling $29,071,620), and

   2. 19,006 tests without specimen collection at $100 per test (totaling $1,900,600).

23. Because Defendant has refused to reimburse Plaintiffs for 903,222 COVID-19 tests over a twelve-month period, in clear breach of both its statutory and contractual obligations, and since Defendant's gross—and indeed negligent—mismanagement of the Uninsured Program has directly caused Plaintiffs substantial harm, Plaintiffs are entitled to recover damages at their full Billing Rate rather than at HRSA's discounted Payment Rate. The UIP was designed to ensure timely and complete reimbursement to providers who rendered testing services to uninsured individuals, yet Defendant's failure to honor its obligations has deprived Plaintiffs of hundreds of millions of dollars in earned compensation.

24. Moreover, under the Government Acts previously defined, non-contracted insurance payors are required to reimburse COVID-19 test providers at their full published billing rate. Having failed to comply with its obligations, Defendant cannot now invoke HRSA's reduced Payment Rate as a shield against liability. Instead, Defendant should be required to compensate Plaintiffs at their Billing Rate for all unreimbursed tests, thereby restoring

them to the position they would have occupied had Defendant fulfilled its statutory and contractual duties.

25. As outlined in the OIG Report, the government's failure to implement adequate verification processes for patient insurance status, particularly for Medicaid and Medicare eligibility (but also for private coverage as well), directly contributed to the premature depletion of the UIP fund. Despite having the capability to verify Medicaid and Medicare eligibility for laboratories and medical centers like Plaintiffs, the government neglected to provide weekly eligibility files to providers like Plaintiffs, a standard practice during the COVID-19 crisis. This failure prevented timely identification of insured patients including patients with Medicare/Medicaid resulting in improper claims that drained the UIP fund, allowing the government to retain billions in unallocated funds in Medicare/Medicaid. Upon information and belief, HHS had a self-interest in withholding such verification data to limit disbursements and redirect UIP funds internally away from Medicare/Medicaid, breaching its statutory mandate under the CARES Act and FFCRA, to ensure reimbursement for eligible claims, as well as Plaintiffs' contractual expectations under the UIP Terms and Conditions. This mismanagement renders Defendant liable for all eligible claims submitted by Plaintiffs. According to OIG Report, the volume of testing costs improperly shifted from Medicare to the UIP was substantial—indeed, far exceeding the total value of Plaintiffs' unreimbursed claims. This further confirms that the government's

mismanagement, not Plaintiffs' conduct, was the principal driver of UIP depletion.

26. HRSA's policy choices ensured that UIP funds would be exhausted prematurely. Specifically, HRSA's refusal to require submission of Social Security numbers ("SSNs") before assigning patient IDs eliminated the sole means of real-time coverage verification—a decision that predictably resulted in improper payments and premature fund exhaustion. By issuing patient IDs based on mere provider attestations—without meaningful eligibility checks—HRSA predictably authorized payments for many insured individuals. This design accelerated the depletion of UIP funds and left compliant providers such as Plaintiffs without reimbursement for legitimately uninsured patients.

27. Moreover, HRSA and its claims administrator, UnitedHealth also possessed direct access to Medicare and Medicaid eligibility data. With minimal effort, HRSA could have conducted weekly cross-matches of patient rosters against these government databases using name, date of birth, and gender. Such routine verification would have flagged insured individuals and preserved funds for genuinely uninsured claims. Instead, HRSA confined verification to SSN-only submissions and delayed checks until 30, 60, or 90 days post-payment—an approach that was manifestly inadequate during the Omicron surge and foreseeably contributed to UIP depletion.

28. To quantify the full extent of improper UIP reimbursements for insured patients (e.g., Medicare/Medicaid), which depleted funds and prevented reimbursement of Plaintiffs' claims, Plaintiffs demand Defendant produce

an exact duplicate of the Karen Lowe report (as referenced in *USA v. LabQ Clinical Diagnostics, LLC*, S.D.N.Y., case no. 1:22-cv-10313) across all HRSA-UIP payments. This report must match records using only name and date of birth, identifying all instances where Medicare/Medicaid-eligible tests were improperly paid from UIP. Such analysis will likely reveal a much larger volume of overpayments, recoverable under OIG recommendations, rendering funds available for Plaintiffs' claims.

### D. The December 2021 Surge and UIP Closure

29. In May 2020, HRSA entered into Letter Contract No. 75R60220C00005 with UHSI, formalized through a Performance Work Statement (PWS) that outlined UHSI's responsibilities for processing claims and facilitating payments to providers under the UIP. In July 2021, this contract was novated to Optum and redesignated as Contract No. 75R60221C00004, with services continuing under a series of amendments (P00009 through P00016) that updated funding, timelines, and workloads. Collectively, UHSI and Optum will be referred to as "UnitedHealth".

30. As required, Plaintiffs submitted claims for reimbursement for COVID-19 testing services to the government via UHSI and, subsequently, Optum. Plaintiffs worked diligently and complied with all UIP's and the UIP Terms and Conditions, including for example, obtaining patient attestations regarding their insurance status. Once UnitedHealth confirmed that a patient did not have active insurance coverage, it issued temporary member IDs for Plaintiffs' billed claims. Notably, UnitedHealth did not issue

temporary member IDs if it identified active coverage. Eligible claims were then required to be processed and paid.

31. The issuance of such IDs constituted the government's preliminary acceptance of the claim and confirmation that the test qualified for reimbursement at Medicare-equivalent rates. Plaintiffs relied on these assurances in good faith when conducting hundreds of thousands of tests during the surge.

32. In December 2021, New York faced an unprecedented surge in COVID-19 cases due to the Omicron variant, with daily case counts peaking at over 85,000 on January 8, 2022. The New York Times reported, "New York City is experiencing its most intense surge of the pandemic" [available here], a crisis that crippled testing infrastructure and overwhelmed providers like Plaintiffs.

33. LabQ alone performed 559,316 tests in December 2021, a tenfold increase from prior months, relying on the UIP's promise of reimbursement. This surge flooded Plaintiffs' systems, delaying patient roster uploads and claims submissions as staff worked around the clock to process tests and meet public demand.

34. Under the UIP, providers like Plaintiffs, were allowed to submit claims for reimbursement within 365 calendar days from the date of the testing service.

35. On March 15, 2022, HRSA abruptly announced that the UIP would cease accepting new claims by March 22, 2022—giving providers virtually no

14

notice beyond six days. This unreasonable cutoff, compounded by the December surge and persistent system delays, prevented Plaintiffs from submitting claims for a majority of the 903,222 tests, despite their diligent efforts.

36. Nevertheless, Plaintiffs' good-faith performance and reliance on the UIP's statutory and contractual assurances and obligations, including the explicit promise that the government will reimburse them for eligible services, obligate HRSA to pay for all tests performed, regardless of submission status.

## E. Additional Expenses

37. In addition, Plaintiffs incurred over $22,403,457 in third-party verification and data-management expenses to determine the insurance status of patients. These costs were reasonably necessary to compensate for HRSA's grossly deficient eligibility framework and its abrupt six-day closure of the UIP portal, and were borne by Plaintiffs in reliance on Defendant's promise of payment.

## F. Subsequent Payments

38. Since the termination of the HRSA COVID-19 UIP on March 22, 2022, Plaintiffs have continued to invest significant resources in efforts to collect insurance information for patients tested for COVID-19 and recover payment from non-HRSA payors. Through these diligent efforts, at a cost to

Plaintiffs of $1,138,996 to date, Plaintiffs have successfully recovered to date approximately $8 million from non-HRSA payors for patients, which, pursuant to the UIP Terms and Conditions, will be part of a reconciliation.

## G. Contractual Obligations under UIP Terms and Conditions

39. The UIP Terms and Conditions, which Plaintiffs accepted by enrolling in the program and providing COVID-19 testing services, constitute an express contract with HRSA, obligating the government to reimburse Plaintiffs for eligible tests performed on uninsured individuals.

40. Specifically, the UIP Terms and Conditions stated:

The Secretary will reimburse the Recipient generally at 100 percent of Medicare rates (including any amounts that would have been due to the Recipient as patient cost sharing) for the items and services that the Recipient provided to Uninsured Individuals for which the Recipient submits claims to the Uninsured Program Fund unless otherwise noted.

[available here].

41. HRSA's FAQs reinforced this obligation, stating:

This program provides reimbursements on a rolling basis directly to eligible providers for claims attributed to the testing [...] for uninsured individuals.

[available here].

42. These assurances formed the contractual framework Plaintiffs relied upon.

43. HRSA's structured process—requiring Plaintiffs to enroll in the UIP Portal, submit patient rosters, obtain Temporary Patient IDs, and submit claims through the MEDI system—further evidences the formal contractual framework between HRSA and Plaintiffs, under which reimbursement was promised for eligible services.

16

44. The UIP Terms and Conditions impose specific performance obligations on Plaintiffs, including certifying with each claim submission that the patients were uninsured at the time of service and that the services were medically necessary, conditions Plaintiffs met for the tests performed, thereby triggering HRSA's obligation to reimburse.

45. Consideration existed: Plaintiffs provided critical testing services, benefiting the government by fulfilling its public health objectives, while HRSA promised payment. The terms, reinforced by HRSA's public assurances and the statutory mandate, evidenced mutual intent and authority via the Secretary of HHS.

46. Plaintiffs performed their obligations, but HRSA breached the contract by failing to reimburse the 903,222 tests. The contract's core promise—reimbursement for services rendered—went unfulfilled.

## COUNT I: TUCKER ACT CLAIM FOR VIOLATION OF MONEY-MANDATING STATUTE

47. Plaintiffs incorporate each allegation of this complaint as if fully set forth herein.

48. The statutory framework, including the (1) CARES Act, (2) the Families First Coronavirus Response Act, (3) the Paycheck Protection Program and Health Care Enhancement Act and (4) the American Rescue Plan Act, coupled with the subsequent appropriation of public funds by Congress and the administrative implementation of the UIP reimbursement regime, created a money-mandating regime, requiring reimbursement for eligible testing services. Moreover, Defendant's refusal to reimburse violates

17

money-mandating statutes, as OIG-identified overpayments (e.g., via Karen Lowe-style DOB/name matching) create recoverable funds for mandated reimbursements.

49. Plaintiffs performed 903,222 eligible COVID-19 tests, which were reimbursable in the amount of $542,879,073, or alternatively, $108,622,618, plus $22,403,457 incurred by Plaintiffs for insurance verification of patients. The Defendant's refusal to pay violates this mandate, entitling Plaintiffs to damages under the Tucker Act.

### COUNT II: BREACH OF CONTRACT

50. Plaintiffs incorporate each allegation of this complaint as if fully set forth herein.

51. The UIP Terms and Conditions of the COVID-19 Uninsured Program, administered by HRSA, constitute an express contract with Plaintiffs. Specifically, HRSA's promise that "the Secretary will reimburse the Recipient generally at 100 percent of Medicare rates" for eligible testing services created a binding contractual obligation.

52. Mutual Intent to Contract: HRSA demonstrated intent to contract through the UIP Terms and Conditions, which explicitly stated that "the Secretary will reimburse" providers, and through public statements urging providers to expand testing. Plaintiffs showed intent by enrolling, complying with requirements, and performing the 903,222 tests in reliance on HRSA's assurances of payment. HRSA's intent to contract is evidenced by its structured UIP process, including mandatory enrollment, patient roster

submissions, and claim adjudication, coupled with explicit promises in the UIP Terms and Conditions and FAQs (e.g., "This program provides reimbursements on a rolling basis directly to eligible providers," available at https://www.hrsa.gov/provider-relief/about/covid-uninsured-claim/faq), which collectively demonstrate a clear intent to bind the government to reimburse compliant claims.

53. Offer and Acceptance: HRSA offered reimbursement at Medicare rates for eligible tests via the UIP Terms and Conditions, which Plaintiffs accepted by enrolling and performing the tests, forming a binding agreement. HRSA's offer was formalized through the UIP Terms and Conditions, which Plaintiffs accepted by enrolling in the UIP Portal, attesting to compliance with all program requirements, and submitting claims for eligible tests between April 2020 and March 2022, as confirmed by UnitedHealth's issuance of Temporary Patient IDs for each claim, indicating preliminary eligibility verification.

54. Consideration: Plaintiffs provided testing services critical to the Defendant's pandemic response, while HRSA promised reimbursement, establishing mutual benefit and obligation. The Defendant received a direct benefit by leveraging Plaintiffs' infrastructure to meet its public health goals. Plaintiffs' provision of the 903,222 COVID-19 tests to uninsured individuals directly benefited the Defendant by enabling HRSA to fulfill its statutory mandate under the CARES Act and FFCRA to ensure widespread testing, thereby reducing community spread and avoiding the need for the Defendant to establish its own testing infrastructure.

55. <u>Performance and Breach</u>: Plaintiffs performed by conducting 903,222 eligible tests and the Defendant breached the contract by failing to reimburse Plaintiffs for these tests, despite Plaintiffs' reliance and performance, including for tests not submitted due to the December 2021 surge and the program's March 22, 2022, closure. The contract's core promise—reimbursement for services rendered—went unfulfilled.

56. Defendant's administrator UnitedHealth's issuance of temporary member IDs, when no active coverage was detected, provides objective evidence of acceptance under the UIP contract. These identifiers reflected a government determination of preliminary eligibility and reinforced Plaintiffs' reasonable expectation of payment.

57. Furthermore, HRSA's abrupt six-day cutoff of claims intake invoked the prevention doctrine: the government may not impede performance and then rely on non-performance as a defense. Claims thwarted by the cutoff must be treated as constructively submitted and payable.

58. Moreover, Defendant's gross and negligent mismanagement of the UIP constitutes a material breach of the express contract formed through the UIP Terms and Conditions. HRSA, tasked with administering the UIP, failed to implement adequate oversight and verification mechanisms to ensure the program's fiscal integrity, leading to the premature depletion of allocated funds. As alleged above, according to the OIG Report, HRSA's lack of robust controls allowed improper claims to drain the UIP fund, undermining the program's purpose of reimbursing providers like Plaintiffs

for eligible COVID-19 testing services. Specifically, HRSA neglected to provide providers with timely access to Medicaid and Medicare eligibility data, a critical tool for verifying patient insurance status, despite having the capability to do so. This failure, a standard practice in other healthcare reimbursement programs, resulted in the submission of claims for patients who were later identified as insured, thereby exhausting the UIP's limited resources before Plaintiffs' valid claims could be processed.

59. HRSA's gross and negligent mismanagement directly contravened its contractual obligations to Plaintiffs, who relied on the UIP's promise of reimbursement at Medicare rates for eligible services. By failing to safeguard the fund's solvency, HRSA undermined the contract's core purpose—ensuring payment for testing services provided to uninsured individuals. The abrupt closure of the UIP on March 22, 2022, with only six days' notice, further exacerbated the harm, as it prevented Plaintiffs from submitting claims for 903,222 eligible tests valued at $542,879,073, or alternatively, $108,622,618, despite their compliance with program requirements. This mismanagement, coupled with the Defendant's refusal to honor its reimbursement obligations, constitutes a breach of the express contract, entitling Plaintiffs to damages for the unreimbursed services rendered in good faith.

60. Damages: Defendant's breach caused Plaintiffs damages for the unreimbursed tests of $542,879,073, or alternatively, $108,622,618.

61. In addition, Plaintiffs reasonably incurred $22,403,457 in third-party eligibility-verification and data-hygiene costs. These expenses were

necessitated by HRSA's deficient verification framework and its abrupt six-day closure of the UIP portal. Such reliance and mitigation damages are recoverable as ancillary to the principal money judgment.

Upon information and belief, the contract was authorized by the Secretary of HHS, Xavier Becerra, or another authorized official, who had statutory authority under the CARES Act to establish and administer the UIP. **COUNT III: BREACH OF IMPLIED CONTRACT-IN-FACT**

62. Plaintiffs incorporate each allegation of this complaint as if fully set forth herein.

63. In addition to the express contract formed through the UIP Terms and Conditions, an implied contract-in-fact existed between Plaintiffs and the Defendant. This implied contract arose from the conduct of the parties and the surrounding circumstances, including HRSA's public assurances, the statutory framework, and Plaintiffs' reliance on those assurances in providing COVID-19 testing services to uninsured individuals. HRSA's intent to contract is evidenced by its structured UIP process, including mandatory enrollment, patient roster submissions, and claim adjudication, coupled with explicit promises in the UIP Terms and Conditions and FAQs (e.g., "This program provides reimbursements on a rolling basis directly to eligible providers," available at https://www.hrsa.gov/provider-relief/about/covid-uninsured-claim/faq), which collectively demonstrate a clear intent to bind the government to reimburse compliant claims.

64. <u>Existence of Implied Contract</u>: Through its actions and representations, HRSA impliedly agreed to reimburse Plaintiffs for COVID-19 testing services provided to uninsured individuals. HRSA's structured framework for the UIP, including the enrollment process, patient roster submissions, and claim submission procedures, further evidenced this implied agreement. Plaintiffs, by enrolling in the UIP, complying with its requirements, and providing testing services, accepted this implied offer of reimbursement. HRSA's offer was formalized through the UIP Terms and Conditions, which Plaintiffs accepted by enrolling in the UIP Portal, attesting to compliance with all program requirements, and submitting claims for eligible tests between April 2020 and March 2022, as confirmed by UnitedHealth's issuance of Temporary Patient IDs for each claim, indicating preliminary eligibility verification.

65. <u>Performance by Plaintiffs</u>: Plaintiffs performed under this implied contract by providing over two million COVID-19 tests to uninsured individuals (including the 903,222 tests at issue in this lawsuit) with the expectation of reimbursement. These services were critical to the government's pandemic response and directly benefited the Defendant by expanding testing capacity during this extreme public health crisis. Plaintiffs' provision of over 903,222 COVID-19 tests to uninsured individuals directly benefited the United States by enabling HRSA to fulfill its statutory mandate under the CARES Act and FFCRA to ensure widespread testing, thereby reducing community spread and avoiding the need for the government to establish its own testing infrastructure, as acknowledged in HRSA's public

23

statements (e.g., Webinar, available at https://www.hrsa.gov/provider-relief/about/covid-uninsured-claim, stating "HHS will provide claims reimbursement to health care providers for testing uninsured individuals").

66. <u>Breach by the United States</u>: The United States breached this implied contract by failing to reimburse Plaintiffs for the 903,222 eligible tests, valued at $542,879,073, or alternatively, $108,622,618. Despite Plaintiffs' performance and reliance on HRSA's assurances, the government refused to fulfill its implied obligation to pay for these services, particularly considering the extraordinary circumstances caused by the December 2021 surge and the abrupt closure of the UIP with only a six-day notice on March 15, 2022, which prevented Plaintiffs from submitting all claims by the March 22, 2022 deadline.

67. <u>Moreover,</u> Defendant's mismanagement of the UIP also constitutes a breach of the implied contract-in-fact between Plaintiffs and the United States. The implied contract, arising from HRSA's representations, the statutory framework, and the parties' conduct, obligated the Defendant to reimburse Plaintiffs for eligible COVID-19 testing services provided to uninsured individuals. HRSA's failure to properly manage the UIP fund, as detailed in the OIG Report, directly undermined this implied obligation. The report highlights HRSA's inadequate controls, including its failure to provide real-time eligibility verification tools to providers, which led to the improper allocation of funds to claims for insured patients. This mismanagement caused the UIP fund to be depleted prematurely, preventing reimbursement

24

for Plaintiffs' 903,222 eligible tests valued at $542,879,073, or alternatively, $108,622,618.

68. By neglecting to implement standard verification processes, such as weekly Medicaid and Medicare eligibility files, HRSA frustrated the reasonable expectations of Plaintiffs, who relied on the government's assurances of payment for services critical to the public health response. The sudden termination of the UIP on March 22, 2022, with minimal notice, further violated the implied contract by foreclosing Plaintiffs' ability to submit claims despite their good-faith performance during the December 2021 Omicron surge. The Defendant's actions, driven by administrative negligence, breached the implied contract-in-fact, causing Plaintiffs significant financial harm and entitling them to damages for the value of the unreimbursed services provided.

69. Damages: As a direct result of the government's breach, Plaintiffs have suffered damages in the amount of $542,879,073, or alternatively, $108,622,618, representing the reasonable value of the testing services provided to uninsured individuals, for which Plaintiffs conferred a benefit on the government with the expectation of compensation.

70. In addition, Plaintiffs reasonably incurred $22,403,457 in third-party eligibility-verification and data-hygiene costs. These expenses were necessitated by HRSA's deficient verification framework and its abrupt six-day closure of the UIP portal. Such reliance and mitigation damages are recoverable as ancillary to the principal money judgment.

71. While the UIP Terms and Conditions outlined a formal claim submission process, the implied contract-in-fact encompassed the broader understanding that Plaintiffs would be reimbursed for all eligible testing services provided to uninsured individuals, regardless of whether claims were submitted before the program's abrupt closure. The extraordinary circumstances of the December 2021 surge and the conveniently short notice of the UIP's termination in March 2022 further support the existence of this implied agreement, as Plaintiffs continued to provide services in good faith, relying on HRSA's assurances of reimbursement.

72. Upon information and belief, the contract was authorized by the Secretary of HHS, Xavier Becerra, or another authorized official, who had statutory authority under the CARES Act to establish and administer the UIP.

## COUNT IV: BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

73. Plaintiffs incorporate each allegation of this complaint as if fully set forth herein.

74. The implied covenant of good faith and fair dealing requires parties to a contract to adhere to the terms of that contract, as intended, and thus, not to utilize the contract in a manner that would undercut the purposes of the contract.

75. A contract exists between Plaintiffs and the Defendant.

76. Plaintiffs performed in accordance with the contract, including by furnishing COVID-19 testing services to the uninsured and appropriately submitting claims to the Defendant.

77. The Defendant's actions as described in this Complaint breached the implied covenant of good faith and fair dealing by undermining the purposes of the contract. In particular, Defendant's mismanagement of the UIP breached the implied covenant of good faith and fair dealing inherent in the contract with Plaintiffs. This covenant obligated the Defendant to act in a manner that upheld the contract's purpose—ensuring reimbursement for eligible COVID-19 testing services provided to uninsured individuals. HRSA failed to exercise reasonable care in administering the UIP, as evidenced by the OIG Report, which documented HRSA's lack of adequate controls to prevent improper claims from depleting the UIP fund, as described above.

78. This administrative negligence frustrated Plaintiffs' reasonable expectations of reimbursement for the 903,222 eligible tests they performed, valued at $542,879,073, or alternatively, $108,622,618. HRSA's abrupt closure of the UIP on March 22, 2022, with only six days' notice, further violated the covenant by arbitrarily foreclosing Plaintiffs' ability to submit claims, despite their good-faith reliance on HRSA's assurances during the December 2021 Omicron surge.

79. By mismanaging the UIP fund and failing to implement basic verification mechanisms, the Defendant acted in bad faith, subverting the contract's purpose and depriving Plaintiffs of the promised benefits of their performance. This breach caused Plaintiffs significant financial harm, entitling them to damages for the unreimbursed services rendered in furtherance of the government's public health objectives.

80. HRSA's administration of the UIP also departed from established industry norms. Standard practice in comparable reimbursement programs includes the routine distribution of Medicaid/Medicare eligibility files or equivalent roster-level matches. By failing to provide these basic tools—and by confining verification to SSN-only submissions—HRSA created a foreseeable depletion of program funds that directly frustrated Plaintiffs' contractual expectations of reimbursement.

81. Damages: As a direct result of the government's breach of the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages in the amount of $542,879,073, or alternatively, $108,622,618, representing the reasonable value of the testing services provided to uninsured individuals, for which Plaintiffs conferred a benefit on the government with the expectation of compensation.

82. In addition, Plaintiffs reasonably incurred $22,403,457 in third-party eligibility-verification and data-hygiene costs. These expenses were necessitated by HRSA's deficient verification framework and its abrupt six-day closure of the UIP portal. Such reliance and mitigation damages are recoverable as ancillary to the principal money judgment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Award monetary damages in the amount of $542,879,073 pursuant to Plaintiffs' Billing Rate, or alternatively, $108,622,618 under the HRSA Payment Rate, for the unpaid eligible tests under Counts I, II, III, and IV, together with pre- and post-judgment interest to the extent permitted by law;

2. Award Plaintiffs an additional $22,403,457 in reliance and mitigation expenses reasonably incurred as a result of HRSA's deficient verification framework and abrupt six-day closure of the UIP portal, together with pre- and post-judgment interest;

3. Award Plaintiffs $1,138,996 as the cost to date for continuing to collect insurance information for patients tested for COVID-19 and seeking recovery from non-HRSA payors.

4. Order a program-wide, person-based accounting and reallocation of misdirected UIP payments sufficient to satisfy Plaintiffs' judgment, as incidental equitable relief under 28 U.S.C. § 1491(a)(2)

5. Declare that HRSA's six-day intake closure and SSN-based verification regime breached its statutory, contractual, and implied duties;

6. Order production of a comprehensive Karen Lowe-style report across all HRSA UIP payments, matching on name and DOB, to identify and recover improper Medicare/Medicaid payments from UIP for reallocation to Plaintiffs;

7. Award Plaintiffs their costs and reasonable attorney's fees pursuant to 28 U.S.C. § 2412 or other applicable law; and

8. Grant such other relief as the Court deems just and proper.

<u>Date</u>: October 17, 2025

Respectfully submitted,


_____

L. Marc Zell
ZELL & ASSOCIATES INTERNATIONAL
ADVOCATES, LLC
800 Connecticut Ave., N.W.
Suite 300
Washington, D.C. 20006
Email: *mzell@fandz.com*

Jeffrey E. Michels, Esq.
*Admission application forthcoming*
ZELL & ASSOCIATES INTERNATIONAL
ADVOCATES, LLC
1345 6th Avenue 2nd Floor
New York, New York, 10105
Telephone: (212) 971-1349
Email: *jmichels@fandz.com*


*Counsel for Plaintiffs*